UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWN K. FROST,<br><br>    Plaintiff,<br><br>    v.<br><br>MATTHEW CATE, et al.,<br><br>    Defendants. | Case No. 12-cv-05226-YGR (PR)<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND ADDRESSING OTHER PENDING MOTIONS** |

Plaintiff Shawn K. Frost, a state prisoner incarcerated at Pelican Bay State Prison ("PBSP"), filed this *pro se* civil rights action under 42 U.S.C. § 1983, alleging that prison officials at PBSP were deliberately indifferent to his safety and medical needs in 2012. Specifically, Plaintiff claimed that PBSP Captain Wilber,[1] PBSP Correctional Counselor II S. Soderlund, as well as PBSP Correctional Officers E. R. Burr, Charles W. Essex, P. H. Hicks, T. Higgins, M. Statham, William J. McDonald, M. Senior, and R. L. Shellabarger failed to prevent two inmates from attacking Plaintiff as he was walking back to his housing unit from the law library on February 14, 2012. Plaintiff also claimed that PBSP Registered Nurse ("RN") C. Timoshenko and PBSP Family Nurse Practitioner ("FNP") S. Risenhoover failed to treat his injuries appropriately, specifically a busted nose that he suffered as a result of the attack.

The parties are presently before the Court on Defendants' Motion for Summary Judgment. Dkt. 47. Plaintiff has filed an opposition to Defendants' motion, and Defendants have filed a reply. Dkts. 53, 57. In his opposition, Plaintiff has also filed his own motion for summary judgment, which is opposed by Defendants. Dkt. 53. Finally, there are other pending motions, including Plaintiff's request for leave to file a supplemental complaint (dkt. 56), Defendants' motion to strike Plaintiff's "Addendum to [his] Complaint" (dkt. 58), Plaintiff's motion for appointment of counsel (dkt. 52), and his unopposed motion for consideration of video evidence (dkt. 60), which will all be addressed below.

---

[1] Defendant Wilber's name was initially misspelled as "Wilbur." The Court has been informed that the correct spelling is "Wilber." Dkt. 47 at 1.

Having read and considered the papers submitted and being fully informed, the Court hereby GRANTS Defendants' motion for summary judgment, DENIES Plaintiff's motion for summary judgment, and addresses the remaining pending motions.

# I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## A. Factual Background

### 1. The Parties

At the time of the events set forth in his complaint, Plaintiff was a general population inmate, and was being treated for mental health conditions in the Enhanced Outpatient Program ("EOP"). Dkt. 1 at 3. According to the Mental Health Care Services Policies and Procedures, custody escorts are not required for EOP inmates participating in normal general population activities, including the following:

- Canteen
- Law library
- Clinic appointments
- Ducats
- Visits
- Religious services

Soderlund Decl. ¶ 3; Ex. B at 8. However, "[w]hen necessary, due to an inmate's mental impairment, clinical staff may accompany such inmates to any of the above activities." *Id.* Plaintiff has an "R" suffix custody designation. Soderlund Decl., Ex. A. An "R" suffix is affixed to an inmate's custody designation to identify inmates who have a history of specific sex offenses as defined in California Penal Code § 290. Cal. Code Regs., tit. 15, §3377.1(b). Inmates with "R" suffixes are housed in accordance with their placement score, and do not, absent other custody factors, require single celling. *Id.* at (b)(10).

Defendants Shellabarger, Wilber, Soderlund, Statham, Senior, Essex, Hicks, Higgins, McDonald, and Burr are, or were at the time of the events alleged in Plaintiff's complaint, members of the custody staff at PBSP. Dkt. 12 at 14-39. Meanwhile, Defendants Timoshenko and Risenhoover are members of the nursing staff at PBSP. Risenhoover Decl. ¶ 1; Dkt. 43-4.

### 2. February 14, 2012 Incident and Prelude to the Incident

On February 14, 2012, Plaintiff appeared at a Unit Classification Committee ("UCC")

hearing. Soderlund Decl. ¶ 2, Ex. A. Plaintiff claims that Defendants Soderlund and Wilber were present at the hearing.[2] Dkt. 1 at 4. Plaintiff claims that at the UCC hearing, he "voiced and informed the entire committee/team of his fear[]s of enem[ies] at PBSP, [h]owever [his] concern[]s were ignored by all who[] were in attendance . . . ." *Id.* The record includes a summary of the UCC hearing and the "actions taken and decisions made" by the committee. Soderlund Decl., Ex. A at 1. In that summary, it states as follows:

> [Plaintiff] is not eligible for 270 housing design placement based on A1 (SHU placement within the last three years). [Plaintiff] expressed his understanding of the basis for the UCC action and disagreed with being cleared to double cell, stating "I can't live with anyone because of my case." [Plaintiff] was explained that his case factors do not preclude him from having a cellmate, and the expectation of general population inmates is to double cell. [Plaintiff] was encouraged by UCC to participate in EOP programs and yard, and work towards finding someone in the program that would be a compatible cellmate for him.

*Id.*

After the UCC hearing, but also on February 14, 2012, Plaintiff claims that he went to visit the law library "under direct escort." Dkt. 1 at 3. When Plaintiff was leaving the law library, he was "patted down" and then he waited to be escorted along with the other EOT inmates "back to [their] assigned housing unit." *Id.* However, Plaintiff claims that Defendant Senior ordered them to "start walking to [their] block;" therefore, they complied with his order. *Id.* Plaintiff claims that "[a]pprox. 1/4 of the way" back to their block, "several mainline inmate[]s ran threw [sic] an unlocked, unsupervised gate, and began a brutal attack" upon Plaintiff and another inmate, John Dee Lambertson (a non-party). *Id.* Specifically, Plaintiff and inmate Lambertson were attacked by three other general population inmates, Sanchez, Coley and Farias. Dkt. 12 at 14-39.

Plaintiff was attacked by inmates Sanchez and Coley, who struck Plaintiff on his head and

---

[2] Plaintiff claims that Defendant Wilber was present at the UCC hearing; however, the record does not seem to indicate his presence at that hearing. Dkt. 1 at 4; Soderlund Decl., Ex. A at 1. Nevertheless, Defendant Wilber does not deny he was present at the hearing; instead, in the motion for summary judgment, Defendants have grouped Defendant Wilber together with their argument that Defendants "were not deliberately indifferent to [Plaintiff's] safety." Dkt. 47 at 6. Accordingly, the Court will assume Defendant Wilber *was present* at the UCC hearing, and it further assumes that Defendants had meant to include Defendant Wilber in their argument that the "events at the [UCC] hearing on the date of the incident could not have put Defendant Soderlund on notice of a risk to [Plaintiff's] safety." Dkt. 47 at 7.

3

upper torso with their fists. *Id.* at 22. Plaintiff claims he suffered a "busted nose (still uncertain to date [of complaint] if broken due to denial of MRI or x-ray by Defendant[s] C. Timoshenko (RN) and S. Risenhoover (FNP))." Dkt. 1 at 3. Meanwhile, inmate Lambertson was attacked by inmate Farias and suffered a laceration to his forehead that required suturing. Dkt. 12 at 15.

Defendants McDonald, Burr, Essex, Hicks, Higgins, Senior, Shellabarger, and Statham responded to the scene, subdued the attackers, and restored order. Dkt. 12 at 14-39.

According to Defendant McDonald, immediately prior to the attack, inmates Sanchez and Coley were standing in line for the prison canteen. McDonald Decl. ¶ 3. The prison canteen is located on the same pathway as the law library. *Id.* Contrary to Plaintiff's allegations above, Defendants claim that there is no gate or fence separating the prison canteen from the law library. McDonald Decl. ¶ 3. Defendant McDonald saw inmate Coley suddenly jump out of line and attack Plaintiff as he was walking on the roadway near the canteen line. *Id.* Inmate Sanchez, who was at the canteen window, immediately left the window and joined inmate Coley in attacking Plaintiff. *Id.*

The record shows that neither inmate Sanchez nor inmate Coley were known enemies of Plaintiff prior to the February 14, 2012 incident. Soderlund Decl. ¶ 4, Ex. C.

### 3. Treatment for Injuries

Directly after the incident, Plaintiff was examined by RN Brown (a non-party), who noted that Plaintiff's nose was swollen and minimally, but actively, bleeding. Plaintiff was treated and returned to his housing unit. Dkt. 12 at 42; Risenhoover Decl., Ex. A.

On March 14, 2012, Plaintiff was examined by Defendant Timoshenko because he was complaining of pain to his nose. Risenhoover Decl., Ex. C. Plaintiff told Defendant Timoshenko that the pain was a three on a scale of one to ten. *Id.* Plaintiff stated that he had been taking acetaminophen for the pain and that it had helped. *Id.* Defendant Timoshenko noted that Plaintiff's breathing was even and unlabored, that he was not short of breath, and that he had no swelling or redness. *Id.* Defendant Timoshenko issued a chrono (an institutional write-up) for ice to be given to Plaintiff and recommended that he consult with Defendant Risenhoover. *Id.*

On March 20, 2012, Plaintiff's nose was examined by Defendant Risenhoover.

4

Risenhoover Decl., Ex. B. Defendant Risenhoover noted that Plaintiff's skin was intact, and that there was no obvious deformity to the nose as well as no swelling, redness or bruising. *Id.* She also noted that Plaintiff was breathing normally through his nose while his mouth was closed. *Id.* She did not refer him to a specialist as it was not medically indicated, given that there was no obvious deformity and Plaintiff was not demonstrating difficulty breathing. *Id.*

### B.      Legal Standard

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to make this showing, "the moving party is entitled to

5

1   a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

2   Only admissible evidence may be considered in ruling on a motion for summary judgment.
3   *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). As noted, Plaintiff has filed an opposition
4   to Defendants' motion for summary judgment; however, the opposition is not verified and will not
5   be considered because it was not signed under "penalty of perjury." Dkt. 53 at 8. However,
6   because the complaint is verified, dkt. 1 at 5, the Court will construe it as an opposing affidavit
7   under Federal Rule of Civil Procedure 56, insofar as it is based on personal knowledge and sets
8   forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 &
9   nn.10-11 (9th Cir. 1995).

### C.   Discussion

#### 1.   Safety Needs Claim

12  The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison
13  officials take reasonable measures for the safety of inmates. *See Farmer v. Brennan*, 511 U.S.
14  825, 834 (1994). In particular, officials have a duty to protect inmates from violence at the hands
15  of other inmates. *See id.* at 833. A prison official violates the Eighth Amendment only when two
16  requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the
17  official is, subjectively, deliberately indifferent to the inmate's safety. *See id.* at 834.

18  To be liable in a failure to prevent harm situation, the official must know of and disregard
19  an excessive risk to inmate safety. *See id.* at 837. The official must both be aware of facts from
20  which the inference could be drawn that a substantial risk of serious harm exists, and he must also
21  draw the inference. *See id.* He need not "'believe to a moral certainty that one inmate intends to
22  attack another at a given place at a time certain before [he] is obligated to take steps to prevent
23  such an assault.'" *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (citation omitted). Before
24  being required to take action he must, however, have more than a "mere suspicion" that an attack
25  will occur. *Id.*; *see, e.g.*, *id.* at 460 (summary judgment appropriate as to defendants when plaintiff
26  "failed to come forward with facts showing that these defendants had any reason to believe he
27  would be attacked by the assailant").

28  When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation

United States District Court
Northern District of California

must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). *Leer* explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." *Id.* In the former case, a broader and more generalized approach to causation is taken. *See id.*

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. Especially when . . . a prisoner seeks to hold a prison employee individually liable because another prisoner attacked him, the prisoner must establish individual fault. Sweeping conclusory allegations will not suffice to prevent summary judgment. . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id.* at 633-34 (citations omitted).

The dispute here focuses on the mental state of each defendant when each acted. Defendants more than met their initial burden on summary judgment. Here, the evidence demonstrates that Defendants McDonald, Burr, Essex, Hicks, Higgins, Senior, Shellabarger, and Statham did not know, and could not have known, that Plaintiff's safety was at risk on February 14, 2012. Plaintiff cannot cite any evidence to show that these Defendants knew that inmates Sanchez and Coley planned to attack Plaintiff. Plaintiff does not claim he was attacked by a known enemy, nor did prison officials consider either inmate Sanchez or inmate Coley (or even inmate Farias) to be one of Plaintiff's known enemies prior to the February 14, 2012 incident. Decl. Soderlund., Ex. C. Moreover, as a general population EOP inmate, Plaintiff was not subject to any special rule that would require him to be separated from other general population inmates while traveling through the prison, specifically, the record shows that he was not required to be escorted through the prison for his protection. Soderlund Decl. ¶ 3; Ex. B at 8. Plaintiff claims that Defendants left a gate unlocked and unsupervised, and that inmates Sanchez and Coley ran through this gate before attacking him. Dkt. 1 at 3. However, Defendants argue that no act or

omission by them led to the attack because there was no gate left unlocked. Dkt. 47 at 5; McDonald Decl. ¶ 3. The record shows that inmates Sanchez and Coley were in canteen line, and without warning or provocation, they attacked Plaintiff as he was passing by on the walkway outside the canteen. McDonald Decl. ¶ 3. Finally, Defendants responded immediately to stop the attack. Dkt. 12 at 14-39. At most the evidence may show negligence in the with regard to the fact that Plaintiff was without an escort or that a gate (between the law library and canteen) was left unlocked, but negligence is not enough to establish an Eighth Amendment violation. *See Farmer*, 511 U.S. at 835-36 & n.4 (Neither negligence nor gross negligence will constitute deliberate indifference.).

Furthermore, the events at the UCC hearing on the date of the incident could not have put Defendants Soderlund and Wilber on notice of a risk to Plaintiff safety. The record shows that Plaintiff stated that he could not have a cellmate because of his "case," and not that he required special protection in any other area of the prison. Soderlund Decl., Ex. A at 1. While Plaintiff claims that he informed the committee of his fear of "enem[ies] at PBSP," dkt. 1 at 4, such a statement is too general. Plaintiff did not specifically name these enemies at PBSP or indicate that he knew of any forthcoming attacks by any of these enemies. In fact, the summary of the hearing indicates that Plaintiff did not express any fear for his safety beyond the general statement, "I can't live with anyone because of my case." Soderlund Decl., Ex. A at 1.

In sum, there was an absence of evidence from which a reasonable jury could conclude that either inmate Sanchez or inmate Coley was known to any defendant to be a danger to Plaintiff while he was at PBSP. When the evidence is viewed in the light most favorable to Plaintiff, and inferences therefrom drawn in his favor, a reasonable jury could not find that Defendants were deliberately indifferent to a known risk to Plaintiff's safety. Therefore, Defendants Soderlund, Wilber, McDonald, Burr, Essex, Hicks, Higgins, Senior, Shellabarger and Statham are entitled to judgment as a matter of law on the Eighth Amendment claim of deliberate indifference to Plaintiff's safety needs. *See Celotex*, 477 U.S. at 323.

### 2. Medical Needs Claim

Plaintiff also alleges that he was denied adequate medical care by Defendants Timoshenko

8

1  and Risenhoover for the injuries he sustained after the February 14, 2012 incident. Specifically,
2  Plaintiff argues that these Defendants denied him an MRI or an x-ray of his busted nose to
3  determine if it was broken. Dkt. 1 at 3.

4  Deliberate indifference to serious medical needs violates the Eighth Amendment's
5  proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).
6  A "serious medical need[]" exists if the failure to treat a prisoner's condition could result in further
7  significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974
8  F.2d 1050, 1059 (9th Cir. 1992) (citing *Estelle*, 429 U.S. at 104), *overruled in part on other*
9  *grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A prison
10 official is "deliberately indifferent" if he knows that a prisoner faces a substantial risk of serious
11 harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer*, 511 U.S. at
12 837.

13 As mentioned above, negligence alone does not warrant liability under the Eighth
14 Amendment. *Id.* at 835-36 & n4. An "official's failure to alleviate a significant risk that he
15 should have perceived but did not . . . cannot under our cases be condemned as the infliction of
16 punishment." *Id.* at 838. Instead, "the official's conduct must have been 'wanton,' which turns
17 not upon its effect on the prisoner, but rather, upon the constraints facing the official." *Frost v.*
18 *Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (citing *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991)).
19 Prison officials violate their constitutional obligation by "intentionally denying or delaying access
20 to medical care." *Estelle*, 429 U.S. at 104-05.

21 In order to prevail on a claim of deliberate indifference to medical needs, a Plaintiff must
22 establish that the course of treatment the doctors chose was "medically unacceptable under the
23 circumstances" and that they embarked on this course in "conscious disregard of an excessive risk
24 to [Plaintiff's] health." *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004). A claim
25 of mere negligence related to medical problems, or a difference of opinion between a prisoner
26 patient and a medical doctor, is not enough to make out a violation of the Eighth Amendment. *Id.*;
27 *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981).

28 Here, Plaintiff claims that Defendants Timoshenko and Risenhoover were deliberately

indifferent in providing treatment for his busted nose. Specifically, as explained above, Plaintiff claims that Defendants Timoshenko and Risenhoover denied his request for an MRI or an x-ray of his nose.

To the contrary, the record shows that Defendants Timoshenko and Risenhoover provided adequate care to Plaintiff. In fact, a total of three nurses—Defendants Timoshenko and Risenhoover and RN Brown—examined Plaintiff after the incident and gave him adequate treatment for his busted nose. First, RN Brown examined Plaintiff directly after the incident. Risenhoover Decl., Ex. A. The Court notes that she did not opine that Plaintiff's nose appeared dislocated, although that is an option on the medical clearance form. *Id.* A month later, on March 14, 2012, Defendant Timoshenko examined Plaintiff, who had complained of pain to his nose. Risenhoover Decl., Ex. C. The record shows that Plaintiff stated that the pain was a three on a scale of one to ten, and that acetaminophen helped ease the pain "a little." *Id.* Moreover, Defendant Timoshenko checked Plaintiff for swelling or redness, and did not note any. *Id.* She also listened to Plaintiff's breathing, and noted that his breath was even and unlabored. *Id.* Defendant Timoshenko recommended that Plaintiff be provided a "temporary chrono" for ice and that he consult with Defendant Risenhoover. *Id.* Finally, when Defendant Risenhoover examined Plaintiff a few days later, on March 20, 2012, she noted there was no obvious deformity to the nose, and no swelling, redness or bruising. Risenhoover Decl., Ex. B. She further noted that there was "mild tenderness" on the "bridge of [his] nose." *Id.* However, Plaintiff, at that time, reported no pain, i.e., a zero on a scale of one to ten. *Id.* Defendant Risenhoover noted that Plaintiff was breathing normally through his nose while his mouth was closed. *Id.* She did not refer him to a specialist as it was not medically indicated, given that there was no obvious deformity and Plaintiff was not demonstrating difficulty breathing. *Id.* Therefore, the Court finds that Defendants Timoshenko and Risenhoover were not deliberately indifferent because they did not deny or delay treatment of Plaintiff's injuries stemming from the February 14, 2012 incident. *Cf. Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989) (summary judgment reversed where medical staff and doctor knew of head injury, disregarded evidence of complications to which they had been specifically alerted and without examination, prescribed contraindicated sedatives).

10

1    Plaintiff further argues that had Defendants Timoshenko and Risenhoover should have
2    ordered an MRI or an x-ray to determine if his nose was broken. The record shows that, at the
3    time Plaintiff had requested for an MRI or an x-ray to be ordered, neither Defendant Timoshenko
4    nor Defendant Risenhoover noted that either was medically necessary. Risenhoover Decl., Exs. B,
5    C. However, Plaintiff seems to argue that an MRI or an x-ray would have led to another course of
6    treatment, i.e., especially if they revealed that his nose was broken, and that Defendants
7    Timoshenko and Risenhoover's course of treatment was medically unacceptable. Dkt. 1 at 3. The
8    Court finds that Plaintiff's argument evidences a difference of medical opinion. First, the Court
9    notes that Plaintiff assumes that his nose was broken when he was initially examined by
10   Defendants Timoshenko and Risenhoover, but they did not notice it. However, Plaintiff puts forth
11   no facts or evidence to support this theory. In fact, even on the date he filed his complaint,
12   Plaintiff admits that he is "still uncertain" if his nose is broken. Dkt. 1 at 3. Plaintiff's conclusory
13   allegation—that Defendants Timoshenko and Risenhoover's course of treatment was medically
14   unacceptable—is not supported by any medical evidence. Plaintiff's conclusory allegations
15   unsupported by factual data are insufficient to defeat Defendants Timoshenko and Risenhoover's
16   motion for summary judgment. *See Toguchi*, 391 F.3d at 1058-60 (summary judgment in favor of
17   defendant doctor appropriate where evidence showed doctor did not believe that Cogentin use
18   presented a serious risk of harm to plaintiff, and where there was no indication in the record that
19   doctor was aware of a risk that plaintiff was suffering from Klonopin withdrawal; claim that
20   doctor failed to conduct a differential diagnosis did not amount to more than negligence and claim
21   that doctor failed to employ emergency treatment was conclusory); *cf. Arpin v. Santa Clara Valley*
22   *Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (finding the district court did not err in
23   granting summary judgment because plaintiff failed to meet her burden of proof of providing
24   specific facts to show that the force used was unreasonable).
25   Even if Plaintiff should have received different treatment for his medical needs, a
26   difference of opinion as to the urgency and treatment of his medical needs is insufficient, as a
27   matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1058, 1059-60;
28   *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th

11

Cir. 1970). Although the medical treatment Plaintiff received may not have been what he considered proper treatment, he presents no evidence that Defendants Timoshenko and Risenhoover were deliberately indifferent to his serious medical needs. Thus, Plaintiff has failed to provide evidence regarding an essential element of his deliberate indifference claim against Defendants Timoshenko and Risenhoover. Therefore, Plaintiff has not set forth sufficient evidence for a reasonable jury to find that Defendants Timoshenko and Risenhoover's denial of his request for an MRI or an x-ray amounted to deliberate indifference to his serious medical needs. Accordingly, they are entitled to summary judgment on Plaintiff's deliberate indifference claim as a matter of law. *See Celotex*, 477 U.S. at 323.

### 3. Qualified Immunity Defense

As an alternative basis for summary judgment, Defendants contend that they are entitled to qualified immunity. Dkt. 47 at 7-8. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The issue of qualified immunity generally entails a two-step process, which requires the court to determine first whether the defendant violated a constitutional right, and then to determine whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court modified the *Saucier* test and "gave courts discretion to grant qualified immunity on the basis of the 'clearly established' prong alone, without deciding in the first instance whether any right had been violated." *James v. Rowlands,* 606 F.3d 646, 650-51 (9th Cir. 2010) (discussing *Saucier* standard after *Pearson*). The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier*, 533 U.S. at 202; *see, e.g.*, *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049-50 (9th Cir. 2002) (court may grant qualified immunity by viewing all of the facts most favorably to plaintiff and then finding that under those facts the defendants could reasonably believe they were not violating the law). In the instant case, the Court has concluded that Plaintiff's constitutional

1  rights were not violated. Thus, viewing the record in the light most favorable to Plaintiff,

2  Defendants prevail as a matter of law on their qualified immunity defense because the record

3  establishes no Eighth Amendment violation. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

4  However, even if a constitutional violation occurred, these Defendants also remain entitled to

5  qualified immunity as to each claim.

### a. Safety Needs Claim

In 2012, the law was clearly established that a correctional officer could not disregard a substantial risk of serious harm to an inmate of which he was aware and had a duty to protect an inmate from violence at the hands of other inmates. *See Farmer*, 511 U.S. at 833. On the day of the incident, February 14, 2012, "it would have been clear to a reasonable prison official that if he knew about an excessive risk to inmate safety, and inferred from the facts of which he was aware that a substantial risk of serious harm exists, he would violate the law by disregarding it." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1050 (9th Cir. 2002). Thus, in the present case, even if a constitutional violation occurred, Defendants Soderlund, Wilber, McDonald, Burr, Essex, Hicks, Higgins, Senior, Shellabarger and Statham remain entitled to qualified immunity. While Plaintiff's right to be free from deliberate indifference to his safety needs was clearly established in 2012, the aforementioned Defendants could have reasonably believed that their actions were lawful, as explained below.

In *Estate of Ford*, the Ninth Circuit clarified the qualified immunity analysis for a deliberate indifference claim. The Ninth Circuit explained that, for an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must subjectively have a sufficiently culpable state of mind, i.e.,

> "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." . . . Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity. *Saucier*,

533 U.S. at 205.

*Estate of Ford*, 301 F.3d at 1050 (quoting *Farmer*, 511 U.S. at 834). In *Estate of Ford*, the Ninth Circuit explained that even though the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Estate of Ford*, 301 F.3d at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3). Because it had not been fleshed out,

> it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being a risk of some harm to a substantial risk of serious harm. *Farmer* left that an open issue. This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted.

*Estate of Ford*, 301 F.3d at 1051 (emphasis in original).

> Defendants specifically argue as follows:
>
> . . . Defendants McDonald, Burr, Essex, Hicks, Higgins, Senior, Shellabarger, and Statham were not deliberately indifferent to Plaintiff's safety needs. As demonstrated above, Defendants did not consider inmates Coley, Sanchez, and Farias to be enemies of Plaintiff. (ECF Nos. 44 at 2; 44-4.) Plaintiff's EOP designation was a mental health designation, and did not require special escorts through the prison. (ECF Nos. 44 at 2; 44-3.) The inmates who attacked Plaintiff were standing in a canteen line, and did not jump an unlocked gate or fence, as Plaintiff claims. (ECF No. 45 at 2.) And finally, when Plaintiff had appeared at committee earlier that day, he merely stated that he did not want a cellmate because of his "R" suffix. (ECF Nos. 44 at 2; 44-2.)

Dkt. 47 at 8.

Applying *Estate of Ford* here proves fatal to Plaintiff's case. A reasonable prison official understanding that he could not recklessly disregard a serious risk to inmate safety could reasonably perceive that the inmate's exposure to any risk of harm was not that high when there was no evidence of a specific threat from the other general population inmates at PBSP upon allowing Plaintiff to walk from the law library to his housing unit without an escort. In fact, the Court again stresses that the record shows that inmates Sanchez and Coley were *not* listed as known enemies to Plaintiff at the time of the incident. Because the law did not put these Defendants on notice that their conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Saucier*, 533 U.S. at 202.

14

Accordingly, Defendants Soderlund, Wilber, McDonald, Burr, Essex, Hicks, Higgins, Senior, Shellabarger and Statham met their burden of proof in their moving papers, and Plaintiff did not introduce evidence to show the existence of a genuine issue of fact on the defense. Therefore, the aforementioned Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

### b. Medical Needs Claim

While Plaintiff's right to be free from deliberate indifference to his serious medical needs was clearly established in 2012, Defendants Timoshenko and Risenhoover could have reasonably believed that their actions were lawful. The record shows that Plaintiff was examined immediately after the attack, and no deformity to his nose was noted by RN Brown. Risenhoover Decl., Ex. A. Defendants Timoshenko and Risenhoover both examined Plaintiff a month after the attack, and noted that there was no deformity to his nose, and that he was not having any difficulty breathing. Risenhoover Decl., Exs. B, C. Plaintiff's claim that Defendants Timoshenko and Risenhoover were deliberately indifferent for denying his request for an MRI or an x-ray of his nose amounts to nothing more than a difference of opinion between medical staff and an inmate. *Toguchi*, 391 F.3d at 1058. Thus, a reasonable medical staff member in the place of Defendants Timoshenko and Risenhoover could have believed that such a decision did not violate Plaintiff's clearly established constitutional rights. Accordingly, Defendants Timoshenko and Risenhoover are entitled, as an alternative matter, to qualified immunity with respect to Plaintiff's aforementioned deliberate indifference claims.

## II. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Included with his unverified opposition is Plaintiff's motion for summary judgment, which consists of statements construed to be an argument that that no genuine issues of material fact remain in dispute and therefore he is entitled to judgment as a matter of law.[3] Dkt. 53 at 6-8. Defendants oppose Plaintiff's motion for summary judgment. Dkt. 57.

Because the parties have filed cross-motions for summary judgment, the Court has

---

[3] Plaintiff had filed a prior motion for summary judgment; however, the Court denied it as premature because it was filed before Defendants had appeared. Dkt. 51 at 2-3.

15

considered all of the evidence submitted by Defendants in support of their motion for summary judgment, as well as the admissible evidence submitted by Plaintiff to evaluate whether summary judgment should be granted to Plaintiff. *See Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1135 (9th Cir. 2001). For the reasons discussed above, the Court concludes that Plaintiff has not established that Defendants acted with deliberate indifference to his safety and medical needs. When the Court, as it must, regards as true Defendants' evidence and draws all reasonable inferences in their favor, *Celotex*, 477 U.S. at 322-23, no genuine issues of material fact exist which entitle Plaintiff to judgment as a matter of law.

Accordingly, Plaintiff's motion for summary judgment is DENIED. Dkt. 53.

### III. OTHER PENDING MOTIONS

#### A. Plaintiff's Motion to File Supplemental Complaint/Defendants' Motion to Strike

In his filing entitled, "Addendum to Plaintiff['s] Complaint," Plaintiff asks the Court to allow him to raise an additional retaliation claim against Defendant Senior stemming from certain alleged retaliatory events that took place in December of 2013, including a strip search and verbal threats. Dkt. 56 at 2-3. The Court construes this as a request for leave to file a supplemental complaint. Defendants' oppose Plaintiff's request, and they have filed a motion to strike the "Addendum to Plaintiff['s] Complaint." Dkt. 58.

The Court may permit a party to serve supplemental pleadings "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed. R. Civ. P. 15(d). The power to grant supplemental pleadings is discretionary and "upon such terms as are just." *Id.* Supplemental pleading by a plaintiff is optional; claims not filed in a supplemental complaint may be filed in a separate lawsuit. *See Manning v. City of Auburn*, 953 F.2d 1355, 1359-60 (11th Cir. 1992).

Supplemental pleading cannot be used to introduce a separate, distinct and new cause of action. *See Planned Parenthood of So. Arizona v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997). Matters newly alleged in a supplemental complaint must have some relation to the claims set forth in the original pleading. *See Keith v. Volpe*, 858 F.2d 467, 474 (9th Cir. 1988), *cert. denied*, 493 U.S. 813 (1989). Leave to file a supplemental complaint therefore may not be granted where the

16

supplemental complaint involves a new and distinct cause of action that should be the subject of a separate suit. *See Neely*, 130 F.3d at 402 (abuse of discretion to allow plaintiffs to supplement complaint after final judgment to attack newly amended statute).

Here, this action has been pending since October 9, 2012. According to Plaintiff's allegations, Defendant Senior retaliated against him by conducting a strip search and verbally threatening him in December of 2013—more than a year after the complaint was filed. Although Defendant Senior is a named defendant in the instant action, and Plaintiff claims the retaliatory acts were a result of his "having exercised his right to bring forth litigation in this case herein," he has introduced a separate, distinct and new cause of action against Defendant Senior. In short, the aforementioned retaliation claim must be the subject of a separate lawsuit. Accordingly, leave to file a supplemental complaint is DENIED, dkt. 56, and Defendants' motion to strike the "Addendum to Plaintiff['s] Complaint" is GRANTED, dkt. 58. The Clerk of the Court shall strike Plaintiff's "Addendum to Plaintiff['s] Complaint" from the record, and shall return it to him.

### B. Plaintiff's Unopposed Motion for Consideration of Video Evidence

Plaintiff filed a motion for consideration of video evidence relating to the February 14, 2012 incident, which is the subject of this lawsuit. Dkt. 60. Defendants have submitted a statement of non-opposition to Plaintiff's motion. Dkt. 61. In addition, Defendants have submitted for the Court's review a disk containing two videos depicting the February 14, 2012 incident. D'Agostino Decl., Ex. A. Defendants claim that they did not originally submit these videos with their motion for summary judgment because they are "inconclusive and not helpful to the trier of fact." D'Agostino Decl. ¶3. However, in response to Plaintiff's request, Defendants chose to submit a copy of the aforementioned videos for the Court's review.

The Court GRANTS Plaintiff's unopposed motion for consideration of video evidence. Dkt. 60. The Court has viewed both videos of the incident at issue; however, it agrees with Defendants in that the videos are inconclusive. Both videos are shot from an angle that is too far away; therefore, the Court could not clearly see the faces of any of the parties depicted in the videos—much less identify any of them on either video. The only information gathered from the videos is that an attack occurred on February 14, 2012; however, the parties do not dispute this.

Accordingly, the Court has chosen not to rely on the two inconclusive videos, and instead it relied on other admissible evidence submitted by the parties.

### C. Plaintiff's Motion for Appointment of Counsel

Because the Court has granted Defendants' motion for summary judgment above, Plaintiff's motion for appointment of counsel is DENIED as moot. Dkt. 52.

## IV. CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Defendants are entitled to judgment as a matter of law on the merits of Plaintiff's Eighth Amendment claims as well as on these Defendants' qualified immunity defense.[4] Defendants' motion for summary judgment is GRANTED as to all claims, and judgment will be entered in their favor. Dkt. 47.

2. Plaintiff's motion for summary judgment is DENIED. Dkt. 53.

3. The "Addendum to Plaintiff['s] Complaint," which has been construed to be a request for leave to file a supplemental complaint, is DENIED. Dkt. 56. Defendants' motion to strike the "Addendum to Plaintiff['s] Complaint," is GRANTED. Dkt. 58. The Clerk shall strike the "Addendum to Plaintiff['s] Complaint" from the record, and shall return it to him.

4. The Court GRANTS Plaintiff's unopposed motion for consideration of video evidence. Dkt. 60.

5. The Clerk of the Court shall enter judgment, close the file and terminate as moot any remaining pending motions, including Plaintiff's motion for appointment of counsel (dkt. 52).

6. This Order terminates Docket Nos. 47, 52, 53, 56, 58 and 60.

IT IS SO ORDERED.

Dated: March 27, 2015

YVONNE GONZALEZ ROGERS
United States District Judge

---

[4] Summary judgment should be granted to Defendants on Plaintiff's punitive damages demand as well. *See* Dkt. 1 at 3. Punitive damages may be awarded in a section 1983 suit only "when defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). Here, there is no indication whatsoever that any of Defendants' alleged wrongdoing rose to this requisite high level of culpability.